## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **HYDROJUG, INC.,** | **Case No. 1:22-cv-00728-PAB** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **FIVE BELOW, INC., et al.,** | **MEMORANDUM OPINION AND ORDER** |
| **Defendants** | |

Currently pending is Plaintiff Hydrojug, Inc.'s Motion for Preliminary Injunction.  (Doc. No. 20.)  Defendants Five Below, Inc. and Gossi, Inc. filed a Brief in Opposition on August 12, 2022 to which Hydrojug replied on August 16, 2022.  (Doc. Nos. 25, 30.)  A hearing on Hydrojug's Motion was conducted before the undersigned on August 17, 2022.  (Doc. No. 32.)  For the following reasons, Hydrojug's Motion for Preliminary Injunction (Doc. No. 20) is granted.

## I.      Background

### A.      The Parties

#### 1.      Hydrojug, Inc.

Plaintiff Hydrojug is a Delaware corporation with its principal place of business in Utah.  (Doc. No. 1, ¶ 1.)  Hydrojug is a domestic and global retailer of large water bottles.  (*Id.* at ¶ 8.)  Hydrojug began selling the Hydrojug "classic" bottle, its "signature, half-gallon" plastic water bottle in 2016:



(*Id.* at ¶ 9; *see also* Doc. No. 20, PageID# 105.)

According to Hayden Wadsworth, founder, CEO, and co-owner of Hydrojug, Hydrojug's water bottles are designed to appeal to customers with "active lifestyle goals."  (8/17/2022 Hearing Transcript, Doc. No. 35, 27:18.)  For example, Hydrojug's trademarked logo incorporates a dumbbell into its design and the Hydrojug lid is designed to maintain a tight seal to prevent leaking and to prevent the flip cap from falling back on the customer while drinking.  (*Id.* at 26:16-27:25.)  Additionally, the bottle itself is designed with flexible, dishwasher-safe plastic to prevent leaks or cracks in the bottle.  (*Id.*)  Hydrojug typically sells its bottles for $10-20 apiece.  (Doc. No. 20, PageID# 104-05.)

Hydrojug maintains an active presence on social media platforms like Instagram and Facebook.  (*Id.* PageID# 106.)  Hydrojug has approximately 469,000 followers on Instagram and 164,000 followers on Facebook.  (Doc. No. 20-2, ¶ 12.)  Additionally, Hydrojug broadly markets its products across social media platforms.[1]  (*Id.* at PageID# 106.)  Hydrojug estimates that in 2022, to date, approximately 50,600,000 people have viewed a Hydrojug advertisement online.  (Doc. No. 20-2, ¶ 12.)

---

[1] A Facebook or Instagram user need not "like" or "follow" Hydrojug's account to receive a Hydrojug ad in their feed.

2

Customers can purchase Hydrojug products through social media platforms like Facebook. Indeed, Mandy Hyer, Hydrojug's Customer Experience Manager, testified that Facebook customers are "a priority as far as [order] fulfillment goes" to ensure that Facebook customers do not have negative experiences with the Hydrojug brand through Facebook.  (Doc. No. 35, PageID# 67:22-24.) Hydrojug also sells its bottles through its website thehydrojug.com, Amazon, and brick-and-mortar retailers like TJ Maxx, Dick's Sporting Goods, Scheel's Sporting Goods, and Tilly's, a chain of skate and surf shops.  (Doc. No. 20, PageID# 104-05; Doc. No. 35, 28:12-16.)  Hydrojug does not sell any products to or through Five Below.  (*Id.*)

### 2.      Five Below, Inc.

Defendant Five Below, Inc. "is a nationwide discount retailer that emphasizes products with a cost of $5 or less."  (Doc. No. 20, PageID# 105.)  Five Below sells its products through its approximately 1200 brick-and-mortar retail stores and its own website fivebelow.com.  (*Id.*)  Five Below also markets its products on Instagram and Facebook and maintains a Facebook shop where customers can purchase Five Below products.  (*Id.* at PageID# 106.)

### 3.      Gossi, Inc.

Defendant Gossi, Inc. supplies products to Five Below.  (*Id.*)  According to Gossi's president David Goss, Gossi has been in business since 2001 and imports a variety of products, including drinkware like mugs and water bottles.  (Doc. No. 26-1, ¶ 2.)  Gossi has imported and sold water bottles to customers since the early 2000s.  (*Id.* at ¶ 3.)  Gossi imported the at-issue "Aquajug"-branded water bottles beginning in January 2022.  (*Id.* at ¶ 9.)

3

**B.**      **Hydrojug's Registered Trademarks and Patent**

Hydrojug owns several HYDROJUG federal trademark registrations for its goods and services, including:

- U.S. Reg. No. 5414493, for the following mark in all colors, for use on "reusable plastic water bottles sold empty," filed on April 21, 2017, registered February 27, 2018, with a first use in commerce date of January 13, 2017:



- U.S. Reg. No. 5870021 for the mark HYDROJUG, for use on "drinking straws; drinking straws of plastic; insulating sleeve holder for bottles; insulating sleeve holders made of neoprene for jars, bottles, or cans; reusable plastic water bottles sold empty," filed April 21, 2017, registered February 27, 2018, with a first use in commerce date of January 13, 2017, and

- U.S. Reg. No. 6015313 for the following mark in all colors, for use on "drinking straws; drinking straws of plastic; insulating sleeve holder for bottles; insulating sleeve holders made of neoprene for jars, bottles or cans; and on-line retail store services featuring hydration products and accessories, namely, water bottles, drinking bottles for sports, and bottle accessories including sleeves, carriers, and straws; and on-line retail store services featuring hydration products and accessories, namely, water bottles, drinking bottles for sports, and bottle accessories including sleeves, carriers,

4

and straws," filed July 9, 2019, registered March 17, 2020, with a first use in commerce date of January 13, 2017:



(Doc. No. 20, PageID# 105-06.)

Hydrojug also alleges that it "has unique product designs that are protected by a portfolio of patents and patent applications, including United States Design Patent No. D887,202 for a CONTAINER TOP ('the '202 Patent') for its water bottles."  (Doc. No. 1, ¶ 11.)  The '202 Patent lid twists onto the top of the Hydrojug bottle, snaps closed, and includes a carrying loop:



(Doc. No. 1-2.)

### C.    Gossi, Inc. Designs and Sells the Aquajug to Five Below

In the summer of 2021, Gossi, Inc. became familiar with "large size water bottles through various customer Style Guides".  (Doc. No. 26-1, ¶ 4.)  During the hearing, David Goss, president of Gossi, clarified that stores like Walmart and Kroger promulgate so-called "style guides" to indicate to product designers and manufacturers the types of products the stores are interested in carrying for the following seasons.  (Doc. No. 35, PageID# 91:4-9.)  Goss came across a Hydrojug in a retailer style guide.  (*Id.*)  Goss testified that he obtained and examined a Hydrojug prior to designing the

Aquajug.  (*Id.* at 90:4-13.)  According to Goss, the Hydrojug he examined did not have any markings on it to indicate that the Hydrojug's lid was subject to a design patent.  (*Id.*; Doc. No. 26-1, ¶ 5.)  After reviewing these 2021 style guides and examining the Hydrojug, Goss designed "version 1" of the Aquajug, which included a carrying loop on the lid:



(*Id.*)  Between August and October 2021, Gossi placed purchase orders with a manufacturer for approximately 235,000 version 1 Aquajugs.  (Doc. No. 26-1, ¶ 6.)  Approximately 150,816 version 1 Aquajugs shipped to Five Below between January and March 2022.[2]  (*Id.* at ¶ 9.)

On February 17, 2022, Goss became aware that the Hydrojug lid was subject to a design patent.  (Doc. No. 26-1, ¶ 10.)  By then, however, 150,816 version 1 Aquajugs with looped lids had already shipped to Five Below.  (*Id.*)  During the hearing, the Court asked Goss to explain how he came to learn that Hydrojug had a patent on its lid.  (Doc. No. 35, 91:9-11.)  Goss testified that, in the course of his "inspirational search" on water bottles and his review of the style guides, he saw the

---

[2] During the hearing, some confusion arose about when these version 1 Aquajugs began to arrive to Five Below.  In his Declaration, Goss represented that, as of February 17, 2022, 150,814 version 1 Aquajugs had already been shipped to Five Below.  (Doc. No. 26-1, ¶ 10.)  However, Goss testified during the hearing that he believed the version 1 Aquajugs would have arrived to Five Below at least 60 to 70 days after they shipped to Five Below in February and March.  (Doc. No. 35, 95:25-96:15.)  But according to Defendants' Hearing Ex. FF, Elle Finan's 2022 YTD Recap of the Aquajug's sales and inventory, the "First Receipt Date" is "2/16/2022."  Defendants' counsel represented that Ex. FF indicated that the Aquajugs arrived in the United States on February 16, 2022, but she acknowledged that she did not ask Finan to testify about the meaning of the "First Receipt Date" on Ex. FF.  (Doc. No. 35, 121:1-15.)

Hydrojug, visited the website, and saw that Hydrojug listed its patent at the bottom of its website.[3] (*Id.*)  According to Goss's declaration, on February 17, 2022, he learned about Hydrojug's patent and on February 18, 2022, he ordered the manufacturer to cease production on, and destroy all remaining, version 1 looped lids.  (Doc.  No. 26-1, ¶¶ 11, 13.)  During the hearing, Goss testified that he did not immediately tell Five Below that Hydrojug had a patent on its lid design.  (Doc. No. 35, 87:15-88:13.) Shortly after Goss ordered the 84,000 looped lids destroyed, Gossi shipped approximately 84,000 "version 2" Aquajugs—i.e., Aquajugs without looped lids—to Five Below between April and May 2022:



(Doc. No. 26-1, ¶ 14.)

Goss testified that he subsequently told someone at Five Below about Hydrojug's patented lid design sometime after the 84,216 lids were destroyed.  (Doc. No. 35, 91:12-92:10.)  Goss could not recall the exact date that he told Five Below about the Hydrojug patent, but estimated that it was sometime after February 18, 2022 and before Hydrojug's counsel, Preston Frischknecht, sent a cease-and-desist letter to Defendants.[4]  (*Id.* at 92:16-94:24.)  Goss also could not remember which Five Below employee he told about Hydrojug's patent, but believed it was either Finan or her associate,

---

[3] Goss did not explain why he apparently performed another inspirational search and review of the style guides in February 2022 when he had previously done so in the summer of 2021.

[4] Frischknecht, sent a cease-and-desist letter to Defendants on April 18, 2022.  (Doc. No. 30-2, ¶ 2.)

Corinne Justin. (*Id.*) Goss testified that after he spoke to someone at Five Below about the Hydrojug patent, Five Below did not discuss removing the Aquajug from Five Below's stores or indicate that it would stop selling any of the 150,000 Aquajugs with looped lids that remained. (*Id.*)

According to Elle Finan, a senior buyer for Five Below, she could not remember any conversation with Goss prior to the beginning of the instant lawsuit in which he told her that Hydrojug had a patent on its lid design. (Doc. No. 35, 103:25-104:12.) Finan testified that the first time she heard about Hydrojug's patent was when she was notified of the instant litigation. (*Id.*)

### D. Aquajug Enters the Market in March 2022

In March 2022, Five Below began selling the Gossi-supplied Aquajugs for $5 apiece. (Doc. No. 20, PageID# 105; *see also* Doc. No. 35, 68:7, testimony from Mandy Hyer that she saw the first social media comment confusing Hydrojugs with Aquajugs on 3/6/2022.) Five Below sold black, teal, pink, and grey Aquajugs—all colors similar to Hydrojug colors sold through 2021. (Doc. No. 20, PageID# 105; *see also* Plaintiff's Hearing Exs. 1-3.) Hydrojug asserts that these Aquajugs are "substantially identical" to Hydrojug's water bottles:

 

(Doc. No. 20, PageID# 105.)

Further, Hydrojug asserts that Defendants' Aquajug bottles incorporate Hydrojug's '202 Patent design into their own bottles:

8



*Figure 4, '202 Hydrojug Patent*          *Gossi/Five Below Aquajug*

(*Id.* at PageID# 108.)

In early March 2022, Hydrojug began receiving comments on its social media posts and ads in which consumers confused Five Below's Aquajugs for a Hydrojug-affiliated product.  (*Id.* at PageID# 106; Doc. No. 35, 68:6-14.)  Hydrojug asserts that it is aware of at least 28 recent instances of actual customer confusion caused by Defendants' Aquajugs between March and August 2022.  (*Id.*; Doc. No. 30-1.)  Hydrojug identified at least 28 separate instances from Facebook and/or Instagram in which users posted comments such as "I just seen this exact hydro jug at five below…5.00 3 different colors. . . . same size and logo" ; "Got the same jug at 5 below" ; and "I bought one at 5 below and it leaked.  Took it back," to which another user commented "ohh ok I started to get one glad i didn't."  (*Id.* at PageID# 107.)

Hyer testified that the number of online comments that Hydrojug, Inc. has received confusing its Hydrojug with Aquajug have increased since March 2022.  (Doc. No. 35, 68:4.)  Hyer testified that she typically sees comments confusing the Aquajug for the Hydrojug on Hydrojug's social media posts at least three times a week, and sometimes as often as once per day.  (*Id.* at 68:23-25.)  Hyer testified that it is difficult for Hydrojug to respond to these online comments.  For example, Hydrojug is unable to delete users' comments from Facebook because Facebook's advertising algorithm would flag a brand deleting customers' comments as suspicious activity and suspend the brand's Facebook account.  (*Id.* at 67:10-21.)  Additionally, Hyer testified that there have been instances in which one user commented that Hydrojugs are available at a cheaper price at Five Below which then spurred

extended comment threads embedded within a Hydrojug social media post about how to purchase cheaper "Hydrojugs" at Five Below.  (*Id.* at 68:18-20.)

### E.    Defendants Create Aquajug "Version 3"

Sometime on or prior to July 18, 2022, Defendants' counsel engaged in a call with Frischknecht.  (Ex. 1, Doc. No. 30-2, PageID# 397.)  On July 18, 2022, Defendants' counsel Eleanor Hagan sent Frischknecht a letter to follow up on their call and to make Hydrojug "aware of a few additional facts as it contemplates next steps, including the preliminary relief [Frischknecht] said [his] client had authorized [him] to seek on its behalf."  (*Id.*)  Therein, Hagan explained that, as early as February and before receiving Frischknecht's cease-and-desist letter in April 2022, Gossi had changed the design of its accused lid to the following:



(*Id.*)  Hagan represented that the "accused lid is being sold off as Gossi is transitioning to the new design," but that Gossi could not "say with 100% certainty that all of the bottles with the accused lids" were off Five Below's shelves as of July 18, 2022.  (*Id.*)  Hagan's letter comports with evidence adduced at the hearing that neither Goss nor Five Below can determine how many, if any, version 1 "looped" lids remain for sale in Five Below's stores.  (*See* Doc. No. 35, PageID# 517, 527.)

Additionally, Hagan also indicated that, with respect to Hydrojug's trademark claims, "Gossi has changed the logo design" for the Aquajug to the following logo:



(*Id.* at PageID# 398.)  According to Hagan, "[b]ottles featuring the new logo and lid design began shipping in June."  (*Id.*)

Hydrojug's Motion for Preliminary Injunction does not address "version 3" of the Aquajug—i.e., Aquajugs without looped lids and with this new logo.  (*See* Doc.  No. 20.)  During the hearing, Defendants requested, and the Court allowed, supplemental briefing about whether Hydrojug was also entitled to a preliminary injunction with respect to Defendants' version 3 Aquajugs.  (Doc. No. 35, PageID# 441.)  Defendants included a photograph of the version 3 Aquajug in its supplemental brief in opposition:



(Doc. No. 36, PageID# 556.)  The version 3 Aquajug is not yet sold in stores.  (*Id.*)

## II.    Procedural History

Hydrojug filed a Complaint against Five Below and Gossi on May 5, 2022.  (Doc. No. 1.) Hydrojug asserted six claims against Five Below and Gossi: (1) trademark infringement pursuant to 15 U.S.C. § 1114; (2) false designation of origin and unfair competition pursuant to 15 U.S.C. § 1125(a); (3) Ohio common law trademark infringement; (4) Ohio common law unfair competition;

11

(5) infringement of U.S. Patent No. D889,914; and (6) violation of Ohio's Deceptive Trade Practices statute, pursuant to Ohio Rev. C. § 4165.02(A)(2).  (Doc. No. 1, ¶¶25-67.)

On July 15, 2022, Defendants filed an Answer to Hydrojug's Complaint, as well as two counterclaims against Hydrojug.  (Doc. No. 15.)  Defendants assert the following counterclaims: (1) declaratory judgment of noninfringement and cancellation of Hydrojug's U.S. Trademark Reg. Nos. 5870021, 5414493, and 6015313; and (2) declaratory judgment of patent invalidity of Hydrojug's 'D202 patent.  (*Id.* at ¶¶ 22-31.)

On July 22, 2022, Hydrojug filed the instant Motion for Preliminary Injunction, in which it seeks to stop Defendants from: (a) continuing to infringe the HYDROJUG registered trademark with the AQUAJUG mark; and (b) unlawfully marketing and selling knock-off water bottle lid designs that infringe Hydrojug's patent.  (Doc. No. 20, PageID# 101.)  On July 27, 2022, this Court set a hearing on Hydrojug's Motion for August 17, 2022.  (*See* ECF Entry 7/28/2022.)

On August 17, 2022, the Court conducted a hearing on Hydrojug's Motion.  (Doc. No. 32; *see also* Doc. No. 35.)  The Court heard argument from the parties' counsels, as well as testimony from Hydrojug's witnesses, Hayden Wadsworth and Mandy Hyer, and Defendants' witnesses, David Goss and Elle Finan.  (*Id*.)  Defendants' counsel requested, and the Court granted, permission to file supplemental briefing on whether Hydrojug asserted a trademark infringement claim against Defendants for "version 3" of the Hydrojug in its Reply and on the issue of an appropriate bond.  (*See* Doc. No. 30-2, Ex. 1.)   Defendants filed their supplemental brief on August 23, 2022 to which Hydrojug replied on August 24, 2022.  (Doc. Nos. 36, 37.)

12

## II. Legal Standard

When considering a motion for preliminary injunction, the Court must consider four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without an injunction; (3) whether issuance of an injunction would cause substantial harm to others; and (4) whether the public interest would be served by the injunction. *See National Credit Union Administration Board v. Jurcevic*, 867 F.3d 616, 622 (6th Cir. 2017); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). *See also Palmer v. Harris*, 2018 WL 6062305 at *6 (N.D. Ohio Nov. 20, 2018). These factors should be balanced against each other but are "not prerequisites that must be met." *In re Delorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). *See also Avery Dennison Corp. v. Juhasz*, 924 F.Supp.2d 893, 899 (N.D. Ohio 2013).

A party seeking injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under the circumstances. *See Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000).

## III. Analysis

The Court will consider each of the four preliminary injunction factors separately, as applied to Hydrojug's trademark and patent claims, below.

### A. Likelihood of Success on the Merits

First, the Court considers whether Hydrojug "has demonstrated 'a strong likelihood of success on the merits.'" *Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 543 (quoting

13

*Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)).  "In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success." *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc*., 119 F.3d 393, 402 (6th Cir. 1997). Nonetheless, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.*

### 1.    Trademark Claims Regarding Aquajug Versions 1 and 2[5]

"A party proves trademark infringement by showing (1) that it owns a trademark, (2) that the infringer used the mark in commerce without authorization, and (3) that the use of the alleged infringing trademark 'is likely to cause confusion among consumers regarding the origin of the goods offered by the parties.'"  *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013) (citing *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 515 (6th Cir. 2007)).  "The touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties."  *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997). Here, the parties only dispute whether Hydrojug successfully demonstrates the third consideration, likelihood of consumer confusion.

In the Sixth Circuit, courts consider eight factors (the "*Frisch*" factors) when evaluating whether there is a likelihood of confusion:

> (1) strength of the plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used;

---

[5] Hydrojug's Motion only addresses versions 1 and 2 of the Aquajug and does not address version 3, which incorporates the non-looped lid and new logo.  (*See* Ex. 1, Doc. 30-2.)  Hydrojug only briefly referenced version 3 in its Reply and in the Frischknecht declaration attached thereto.  (*Id.*; *see also* Doc. No. 30, PageID# 371.)  The Court will analyze whether Hydrojug is entitled to a preliminary injunction with respect to Aquajug version 3 separately below.  *See infra*, III.E.

(6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines or services.

*AWGI, LLC v. Atlas Trucking Co., LLC*, 998 F.3d 258, 264-65 (6th Cir. 2021) (citing *Kibler v. Hall*, 843 F.3d 1068, 1073 (6th Cir. 2016)).  According to the Sixth Circuit, "[t]his inquiry presents a mixed question of fact and law—it 'has factual components (e.g., what evidence of confusion has been shown?) and legal components (e.g., what counts as cognizable confusion?).'"  *Id.* (quoting *Sterling Jewelers, Inc. v. Artistry Ltd.*, 896 F.3d 752, 755 (6th Cir. 2018)).

In its Motion, Hydrojug argues that it is likely to succeed on the merits of its claim that Defendants are infringing on its trademark.  (Doc. No. 20, PageID# 109.)  Hydrojug argues that it demonstrates trademark infringement because (1) it owns several Hydrojug-related trademarks, (2) Defendants are using their AQUAJUG mark without Hydrojug's permission, and (3) it establishes likelihood of consumer confusion because Hydrojug has demonstrated that it satisfies all eight of the Sixth Circuit's *Frisch* factors.  (*Id.* at PageID# 109-15.)  In response, Defendants only contest that Hydrojug demonstrates likelihood of consumer confusion.  Defendants argue that Hydrojug cannot demonstrate any of the *Frisch* factors and, therefore, fail to establish likelihood of consumer confusion and, therefore, cannot establish likelihood of success on its trademark infringement claim. (Doc. No. 25, PageID# 205-13.)

### a)      Whether Likelihood of Confusion Exists—the *Frisch* Factor Test

Because Defendants only contest whether Hydrojug has demonstrated a likelihood of consumer confusion, the Court will address each of the eight *Frisch* factors below.

### (1)      Strength of Hydrojug's Mark

The strength-of-the-mark factor "focuses on the distinctiveness of a mark and its recognition among the public."  *Progressive Distrib. Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 427

15

(6th Cir. 2017) (quoting *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 631 (6th Cir. 2002)). A mark's strength is comprised of two components: conceptual strength and commercial strength. *AWGI*, 998 F.3d at 265 (citing *Kibler*, 843 F.3d at 1073).

(a)      <strong>Conceptual Strength</strong>

To determine "conceptual" strength, courts classify trademarks in categories of increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful.  *Id.* (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).

A descriptive trademark "specifically describes a characteristic or ingredient of an article." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 631 (6th Cir. 2002) (internal quotation omitted).  For example, in *Therma-Scan*, the Sixth Circuit affirmed the district court's conclusion that the trademark "Therma-Scan, Inc." was descriptive because it described services that Therma-Scan performed, i.e., performing infrared thermal-imaging examinations of the human body.  *Id.*

A descriptive mark is not "inherently distinctive but may enjoy the benefit of [trademark] protection if [it] develop[s] a 'secondary meaning.'"  *Leelanau Wine Cellars*, 502 F.3d at 512.  "A descriptive mark achieves secondary meaning when 'in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product.'"  *Id.* (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n. 11 (1982)).  Additionally, the Sixth Circuit has "long held that 'evidence of intentional copying shows the strong secondary meaning of [a product] because [t]here is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence.'"  *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 639 (6th Cir. 2002) (quoting *Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts*, 944 F.2d 1235, 1239 (6th Cir.1991)).

16

The Court concludes that Hydrojug's mark is descriptive but has nevertheless acquired secondary meaning and thus is entitled to protection. *Leelanau Wine Cellars*, 502 F.3d at 512-13. The mark, "Hydrojug," plainly communicates that the product is a water (i.e. "hydro") "jug." *Id.* However, the Court also concludes that Hydrojug's otherwise descriptive mark has acquired strong secondary meaning because there is significant evidence that Defendants copied Hydrojug's mark in their design for Aquajugs. Goss admitted that when he set out to design an oversized water bottle for Five Below, he examined a Hydrojug before designing the Aquajug. (Doc. No. 26-2, ¶ 5; Doc. No. 35, 90:7-13.) Goss's admissions of intentional copying constitute evidence that Hydrojug's otherwise descriptive mark has acquired strong secondary meaning. *Abercrombie*, 280 F.3d at 639. Thus, the Court concludes that Hydrojug's mark is conceptually strong.

### (b)     Commercial Strength

To determine "commercial" strength, courts examine a mark's public recognition and the extent to which people associate the mark with the product it announces. *Id.* (citing *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012)). A mark can be conceptually strong without being commercially strong, and thus, ultimately weak. *Id.* "Proof of marketing" may demonstrate a mark's commercial strength. *AWGI*, 998 F.3d at 265. In *AWGI*, the Sixth Circuit concluded that the trademark "Atlas" was commercially strong based on Atlas Movers's advertising expenditures alone. *Id.* at 265. The court concluded that while "advertising expenditures, standing alone, do not always prove commercial strength, *see, e.g.*, *Progressive*, 856 F.3d at 430, they are sufficient in this case because Atlas Movers extensively advertised and the district court could have reasonably inferred that it created 'actual market recognition.'" *Id.*

17

However, "proof that third parties have extensively used a trademark or similar trademarks in the relevant market indicates the trademark is commercially weak." *Kibler*, 843 F.3d at 1074 (citing *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991)). "The presumption is that the third parties have muddled the mark's source." *Id.*  In *Homeowners*, for example, the defendant offered evidence that many "real estate related firms" used trademarks identical or similar to the plaintiff's mark. *Id.*  The *Homeowners* court concluded that a reasonable jury could determine that other firms' use had weakened the commercial strength of the plaintiff's mark. *Id.* at 1103, 1108.

The Court concludes that Hydrojug's mark is commercially strong.  Hydrojug presents evidence that it has spent significant amounts of money on digital media advertising.  (*See* Doc. No. 20-2, ¶ 11.)  For example, in 2021, Hydrojug spent approximately $14,000,000 on digital media advertising.  (*Id.*)  In 2022, to date, Hydrojug has spent approximately $7,000,000 on digital media advertising.  (*Id.*)  Additionally, Hydrojug presented evidence that these advertising expenditures have led to recognition by consumers in the marketplace.  *Cf. Homeowners*, 931 F. 2d at 1108.  For example, Hydrojug's 2021 sales totaled more than $45 million and its 2022 sales total more than $20-25 million to date.  (Doc. No. 25-2, PageID# 231.)  Additionally, Hydrojug currently has more than 469,000 Instagram followers and 164,000 Facebook followers, and more than 50,600,000 people have viewed a Hydrojug ad in 2022 to date.  (Doc. No. 20-2, ¶ 12.)  Thus, the Court concludes that Hydrojug's mark is also commercially strong.

Defendants' arguments about third-party use are not persuasive.  Defendants argue that Hydrojug's mark is commercially weak because myriad other companies sell "hydro"-branded water bottles or use a water droplet in their water bottle logos.  (Doc. No. 25, PageID# 206.)  Defendants

18

rely on a search of active U.S. Patent and Trademark Office records for trademark applications and registrations with the word "hydro" used in connection with bottles, as well as Amazon product listings for water bottles that are branded with the word "hydro" or "aqua," and/or use some kind of water droplet in their logos.  (Doc. No. 25, PageID# 206-07.)  First, as to Defendants' argument that the USPTO records demonstrate extensive third-party use, "it is well-settled that a trademark search report does not constitute evidence of either the existence of a registration or of the existence or extent of use of a mark."  *McCarthy on Trademarks*, § 11:88 (5th ed.).  Thus, the results of Defendants' USPTO search are not especially persuasive.

Second, even though Defendants identified 17 registered marks that contain the term "hydro" that relate to selling "water bottles" sold empty, this statistic, without more evidence, still does little to demonstrate that there is true third-party use of these marks.  As an initial matter, Defendants' statistic is undercut by the fact that two of those 17 marks, the "HYDROSHKR" and the "HYDROSPOUT," are owned by Hydrojug.  (Doc. No. 26-3, PageID# 253.)  Defendants are left with only 15 registered "hydro" marks related to water bottles sold empty and that are not owned by Hydrojug.  Defendants assert that these 15 registrations are "live," but do not offer any evidence that these marks are actively used in the marketplace, or any evidence about the degree of consumer exposure to these marks.  Without more detail about each and every one of these alleged third-party uses, it is impossible for the Court to determine whether their use truly undermines the commercial strength of Hydrojug's own mark.

Third, as to Defendants' argument that there are myriad water bottles for sale on Amazon that incorporate the word "hydro" or "aqua," and/or use a water droplet in the logo, the Court agrees with Hydrojug that none of these marks are as remarkably similar to Hydrojug's mark as Aquajug's is.

19

(Doc. No. 26-5, PageID# 309-10.) For example, the "Dr.hydro" mark features both the word "hydro" and a water drop logo, but looks nothing like Hydrojug's logo. (*Id.*) The word Dr.hydro is written in mostly lowercase letters, with little to no spacing, or "kerning," between the letters, and appears to not be in bold print. (*Id.*) The water drop does not feature any letter inside the droplet or a dumbbell surrounding the droplet like Hydrojug's logo. (*Id.*) Moreover, the overall appearance of the product does not resemble a Hydrojug in any way, other than that the bottle can hold up to a gallon of water. (*Id.*) Likewise, the overall appearance of the "Hydro Bear" bottle is more similar to the Hydrojug than the Dr.hydro bottle, but the Hydro Bear water droplet logo features a cartoon drawing of a bear looking out over a river. (*Id.* at PageID# 313.) Not only is the Hydro Bear logo easily distinguishable from the Hydrojug logo, but the Hydro Bear logo also connotes a sense of outdoorsy exploration while the Hydrojug logo features a dumbbell and is aimed at individuals with "active lifestyle goals." (Doc. No. 35, 28:19-29:4.) None of the Amazon water bottles identified by Defendants resemble the Hydrojug as closely as Aquajug.[6] Third-party usage of the word "hydro" does not diminish the strength of Hydrojug's mark, given the differences between the third-party marks identified by Defendants and Hydrojug's mark. Accordingly, the Court concludes this factor weighs in Hydrojug's favor.

### (2) Relatedness of the Goods

In the Sixth Circuit, courts apply the following test to decide whether relatedness favors either party: "1) if the parties' products compete directly with each other, consumer confusion is likely if the parties' marks are sufficiently similar; 2) if the products are somewhat related, but do not compete directly, the likelihood of confusion will depend on other factors; 3) if the products are completely

---

[6] This close resemblance between Hydrojug and Aquajug is unsurprising, since Goss admitted that he examined the Hydrojug before designing Aquajug. (Doc. No. 35, 90:7-13; Doc. No. 26-1, ¶ 5.)

unrelated, confusion is unlikely." *Kibler*, 843 F.3d at 1076 (citing *Daddy's Junky Music Stores*, 109 F.3d at 282). Services and goods "are 'related' not because they coexist in the same broad industry," but because they "are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *Homeowners Group*, 931 F.2d at 1109. However, just because there is "some overlap between the two services, it does not follow that the companies compete directly for the same base of customers." *Progressive Distrib.*, 856 F.3d at 432. Rather, "[t]he question is, are the [goods or services] related so that they are likely to be connected in the mind of a prospective purchaser?" *Homeowners Grp.*, 931 F.2d at 1109.

The Court concludes this factor weighs in Hydrojug's favor. The parties' products, plastic oversized water bottles, are in direct competition with each other. Both bottles are the same size (64 ounces), manufactured in similar colors, and—as discussed below—feature nearly identical marks. (*Compare* Plaintiff's Hearing Ex. 1 *to* Plaintiff's Hearing Exs. 2 and 3.) Moreover, Hydrojug typically sells its bottles for $10 -20 per bottle and Aquajug sells its bottles for $5 per bottle. (Doc. No. 20-2, ¶ 6, *see also* PageID# 171.) Aquajug's price point is significant: visually, Aquajugs are nearly identical to Hydrojugs yet sell for a fraction of the cost of a Hydrojug. Thus, it appears that Defendants not only intended to compete directly with Hydrojug by marketing a bottle with a nearly identical appearance, but to undercut Hydrojug by marketing a cheaper version of a similar bottle.

Defendants assert, without support, that this factor is either neutral or not established in Hydrojug's briefing. The Court disagrees. To the contrary, some of Hydrojug's examples of consumer confusion on social media answer the question posed in *Homeowners Group*, i.e., whether the goods are so related as to be connected in the minds of prospective purchasers. *Homeowners*

21

*Grp.*, 931 F.2d at 1109.  In example 4, one consumer commented on a Hydrojug Facebook advertisement that she saw "this exact hyd[r]o jug at five below…5.00 3 different colors."  (Doc. No. 20-1, PageID# 129.)  Another user replied to ask if "it was the actual Hydrojug," to which the first consumer replied, "yes.. **same size and logo**… I almost bought it."  (*Id.*, emphasis added; *see also* Doc. No. 20-1, PageID# 126, 128, 132, 135, 137-40.)  Clearly, some prospective purchasers *are* confused about the origins of the Aquajug and believe (wrongly) that the Aquajug *is* a Hydrojug product.  Accordingly, the Court concludes that the goods are closely related, and this factor weighs in Hydrojug's favor.

### (3)     Similarity of the Marks

According to the Sixth Circuit,

> The more similar the marks are, the more likely it is that relevant consumers will confuse their sources. We determine the similarity of marks by considering whether either mark would confuse a consumer who did not have both marks before her and had only a vague impression of the other mark.  *Daddy's*, 109 F.3d at 283.  We consider the marks' pronunciation, appearance, and verbal translation. *Id.*; *see, e.g., Maker's Mark*, 679 F.3d at 421-22 (finding factor favors plaintiff because marks are facially similar and some companies offer several kinds of distilled spirits).

> The anti-dissection rule requires us not to dwell on the prominent features of a mark and instead consider it as a whole.  *Little Caesar*, 834 F.2d at 571-72; *see, e.g., Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 423-24 (6th Cir. 1999) (finding distinctions in appearance, syllables, language, and pronunciation prevent "JET" and "AEROB–A–JET" from being confusingly similar despite their common word); *Little Caesar*, 834 F.2d at 572 (finding differences in sound, appearance, and syllables distinguish "Little Caesar" from "Pizza Caesar USA" despite the prominent word they share).

*Kibler*, 843 F.3d at 1077.  Nevertheless, to discuss a mark's overall impression, courts often discuss the most salient features that give rise to a mark's overall impression in their analyses.  *Flower Mfg., LLC v. CareCo, LLC*, 466 F. Supp. 3d 797, 814 (N.D. Ohio 2020) (citing *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 795 (6th Cir. 2004), *Leelanau Wine Cellars*, 502 F.3d at 517).

22

Having compared Plaintiff's Hearing Exhibit 1, a Hydrojug, to Plaintiff's Hearing Exhibit 3, an Aquajug, the Court concludes that the Aqujug mark is extremely similar to the Hydrojug mark:



(*Compare* Plaintiff's Hearing Ex. 1 *to* Plaintiff's Hearing Ex. 3.) Both marks incorporate water droplets *and* dumbbells. Each mark features the first letter of the brand name inside the water droplet. The letters inside the water droplet ("H" and "A") each have a prominent crossbar in them. The water synonym in each mark is in a bolded, sans serif font while the word "jug" is in a narrow sans serif font. Additionally, the word marks are in all capital letters on both bottles and there is significant kerning, or spacing, between each letter in "HYDROJUG" and "AQUAJUG." Phonetically, both marks share a similar rhythm in that both combine a two-syllable word for water with the word "jug." Thus, the Court concludes that when all of these various elements are combined, the result is two similar, indeed nearly identical, marks.

The Court rejects Defendants' argument that the marks are substantially different because one mark uses the word "hydro" and the other "aqua." (Doc. No. 25, PageID# 210-11.) First, as discussed above, the Court must consider the overall impression of each mark, rather than dwell on a specific feature of the mark. *See supra*. The fact that Defendants use a different synonym for water does not detract from overall appearance of the marks—particularly when Defendants printed the word "aqua" in all caps, and in a large, bold, sans serif font with similar kerning between the letters just like the

23

word "hydro" on the Hydrojug. Additionally, "hydro" and "aqua" both connote water, so the Court is persuaded that a two-syllable synonym for water, combined with the other visual elements of the bottles, creates a sufficiently similar mark that is likely to confuse consumers of the bottles' origins.

The Court also rejects Defendants' arguments regarding the availability of Hydrojug's "classic" colors, black, pink, mint, and grey. First, there is evidence that Hydrojug's black classic bottles are on back order and awaiting delivery. (Doc. No. 35, 56:3-5.) Second, there is also evidence that Hydrojug's pink, mint, and grey classic bottles are still available for production if and when Hydrojug chooses to produce them. (*Id.* at 59:13-21.) Third, Hydrojug sells its "pro" model in a variety of pastel colors, including a peachy pink (*see* Defendants' Hearing Ex. D) and a pastel lavender (*see* Doc. No. 30-1, PageID# 385-86). Crucially, these Hydrojug "pro" bottles feature the same marks as the Hydrojug classic bottles: the water droplet logo with the dumbbell flanking the "H," and the word "HYDROJUG" stamped in all capital letters in a large sans serif font. The Court is not convinced that consumers would no longer be confused about the bottles' origins because Hydrojug sells peach and lavender bottles and Defendants only sell pink bottles. Indeed, there is evidence of consumers commenting that they purchased "the same thing at Five Below" in response to a Facebook advertisement for a lavender Hydrojug pro bottle. (Doc. No. 30-1, PageID# 385.) Accordingly, the Court concludes that this factor weighs heavily in Hydrojug's favor.

### (4) Evidence of Actual Confusion

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Daddy's Junky Music Stores*, 109 F.3d at 284 (quotation omitted). However, because such evidence is often hard to find, this factor "is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available."

*Id.* (quotation omitted). When evidence of confusion would be unexpected due to a small market or a recent act of infringement, a single instance of actual confusion can serve as strong evidence of potential future confusion. *See id.*; *Little Caesar*, 834 F.2d at 571-72 (recency explains lack of evidence of actual confusion); *Maker's Mark*, 679 F.3d at 422 ("it is reasonable that no meaningful evidence of actual confusion was available" because "the Reserva product was sold for a short time and in limited quantities").

On the other hand, merely "isolated instances of actual confusion after a significant period of time of concurrent sales or extensive advertising" would not necessarily increase the likelihood of confusion, but rather may suggest confusion is unlikely. *Daddy's Junky Music Stores*, 109 F.3d at 284; *see also Progressive Distrib.*, 856 F.3d at 434 (limited evidence of confusion despite mass advertising indicates actual confusion is presumptively unlikely); *Kibler*, 843 F.3d at 1078-79 (10 instances of confusion favor plaintiff only slightly, given massive sales and online interactions).

Other courts have found that social media posts can be anecdotal evidence of actual consumer confusion, including in similar preliminary injunction analyses. *See, e.g., Hope Organics LLC v. Preggo Leggings LLC*, No. 21-CV-2416 (TMR), 2021 WL 5919367, at *8 (S.D.N.Y. Dec. 15, 2021) (noting that "it is not extraordinary in today's Internet age for consumers to communicate with brands in the form of online comments and reviews, and for parties to rely on such comments to present any evidence of actual confusion."); *Heaven Hill Distilleries*, 575 F. Supp. 3d at 832 (concluding that the court had the "best evidence" of consumer confusion, including examples of "actual confusion in social and traditional media alike," including three examples from social media comments and posts); *Museum of Modern Art v. MOMACHA IP LLC*, 339 F. Supp. 2d 361, 378 (S.D.N.Y. 2018)

25

(concluding that the plaintiff demonstrated evidence of actual consumer confusion based on two social media posts and a Yelp review).

Here, Hydrojug presents the Court with "the best evidence" of likelihood of consumer confusion: multiple anecdotal examples of actual consumer confusion, beginning shortly after Five Below began selling Aquajugs in March 2022 up through August 17, 2022, the date of the preliminary injunction hearing.  (*See* Doc. No. 20-1, PageID# 126, Facebook comments dated 3/6/2022; *see also* Doc. No. 35, 68:24, testimony from Hyer that she received another comment confusing Aquajug and Hydrojug after arriving by plane the night before the preliminary injunction hearing.)  Multiple social media posts indicate customers are confused about whether the Hydrojug and Aquajug are the same product, or otherwise related[7]:

_____

[7] The Court has redacted users' last names and photos from Hydrojug's examples.

26



(Doc. No. 20-1, PageID# 126, Example 1 dated 3/6/2022; *see also* PageID# 129, 131, 132, 137, 138, 140, 141; Doc. No. 30-1, PageID# 378, 384, 385, 387.)  In Example 1, user Alyssa posted in a Facebook group called "Hydrojug Addicts" that she saw a bottle at Five Below on March 6, 2022 that "looks exactly like a hydrojug and only $5" at Five Below.  (Doc. No. 20-1, PageID# 126.) Another member of the group, Teylor[8], replied that she "think[s] it is hydrojug" and that Hydrojug "started doing special orders for companies with their logo!"  (*Id.*)

---

[8] In an unusual turn of events, it came out during the hearing that Hyer was personally acquainted with the user "Teylor." According to Hyer, Teylor is a local customer who often "comes in [to Hydrojug] and picks up orders all the time."  (Doc.

Especially troubling are the examples in which consumers complain to Hydrojug about the quality and reliability of their brand and/or product.  In Example 23, user Stephanie replied to a Hydrojug ad on July 26, 2022 that "this same jug is available at five below for $5 so tired of seeing this scammy ad [crying emoji]":

---

No. 35, 76:10-16.)  It is telling that a customer like Teylor, a member of the "Hydrojug Addicts" and a Utah-based customer who places Hydrojug orders "all the time," would confuse an Aquajug as a Hydrojug or Hydrojug-related product.



8/4/22, 1:40 PM

## And pay almost as much for shipping! 😝

✓ Close  |  BUSINESS HOURS ×  |  FIVE BELOW ×  |  +                                         Unassigned ▾

**GB**  🜚 Gorgias Bot  🜚 go to post                                                          07/22/2022
🜚 Mint is The HydroJug Deal of the Week! The Only Half Gallon You'll Ever Need.

**CS**  Courtney⬛⬛  🜚 go to comment                     Shipping/Policy  ▾  | 💬 Message | 🔄 07/25/2022
And pay almost as much for shipping! 😝
                                                                                              👍  53 Other

**CT**  Chelsea⬛⬛  🜚 go to reply                                                            07/26/2022
Courtney⬛⬛ exactly.
                                                                                              👍  1 Other

       Cassidy⬛⬛  🜚 Message hidden                                                          07/26/2022
       Courtney⬛⬛ yessss it's not really a steal at that point 😝

**ME**  Marie⬛⬛  🜚 go to reply                                                              07/26/2022
Courtney⬛⬛ after my first order I got a free shipping code so my next was only $9.99! They're great for kids sports practices/games!
                                                                                              👍  3 Other

**CJ**  Charlotte⬛⬛⬛  🜚 go to reply                                                         07/26/2022
I got the free shipping & am still waiting for my order from when they had the Mauve on sale a couple weeks ago.
                                                                                              👍  3 Other

       Lizz⬛⬛  🜚 Message hidden                                                             07/26/2022
       Courtney⬛⬛ that's the downfall for sure I won't order from them unless I'm getting a large order!! Which sucks when I just want a sleeve

       Janessa⬛⬛  🜚 Message hidden                                                          07/26/2022
       Anyone got a free shipping code for me? My Hydromate busted last week when one of my kiddos bumped it off the counter. They won't even
       discount a new one, so I told them I was ordering a Hydromate.

       ☞ New media files

**Stephanie⬛⬛**  🜚 Message hidden                                                          07/26/2022
       Courtney⬛⬛ this same jug is at five below for $5 so tired of seeing this scammy ad 😝

**PH**  Paige⬛⬛  🜚 go to reply                                                              07/26/2022
Courtney⬛⬛ well you're missing out because they are awesome!! I love mine. Super convenient to carry. Mine even has a pocket that
holds my phone.
                                                                                              👍  1 Other

       Emily⬛⬛  🜚 Message hidden                                                            Saturday
       Courtney⬛⬛ agreed!!! I paid almost $8.00 in shipping 😝

29

(Example 23, Doc. No. 30-1, PageID# 384.)  User Stephanie's accusation that Hydrojug's ad is "scammy" is troubling because it demonstrates that consumers have not only confused Five Below's Aquajug for a Hydrojug but have also determined, due to the price difference between Hydrojugs and Aquajugs, that Hydrojug is an untrustworthy, or "scammy" brand.  (*Id.*)

In Example 6, a customer who purchased an Aquajug contacted Hydrojug's customer service department to request a replacement for a broken Aquajug:



(Example 6, Doc. No. 20-1, PageID# 131.)  Such an example demonstrates that at least some consumers have already actually confused the two brands so deeply that an Aquajug purchaser will reach out to Hydrojug's customer service department, under the (incorrect) assumption that Hydrojug manufactured and sold the cheaper, less reliable Aquajug product.  (*Id.*)

30

These and other examples are troubling because they illustrate that at least some consumers have (wrongly) concluded that Defendants' lower-quality, cheaper Aquajugs are attributable to Hydrojug.  (*See also, e.g.,* Example 12, Doc. No. 20-1, PageID# 137 (responding to a Hydrojug ad to caution buyers to "do [their] research before impulse buying" because the "same exact" Hydrojug was available at Five Below; Example 13, Doc. No. 20-1, PageID# 138 (a user commented that she bought a Hydrojug at Five Below and it leaked so she took it back, and another user commented that she "started to get one," but is now "glad [she] didn't")).  These examples demonstrate that Defendants have not only confused customers about the origin of the Aquajug but have also wrought significant damage to Hydrojug's overall brand perception and consumer opinion about Hydrojug's trustworthiness and reliability.

The Court rejects Defendants' argument that these social media comments are de minimis considering the number of advertisement views and sales that Hydrojug racks up each year.  (Doc. No. 25, PageID# 212.)  First, in *Museum of Modern Art v. MOMACHA*, the court concluded that just *two* social media posts and one Yelp review were sufficient to demonstrate that consumers had actually confused New York City's world-renowned MoMA with a small East Village tea shop. *Museum of Modern Art*, 339 F. Supp. 3d at 378.  Here, Hydrojug presents more than a dozen examples of consumer confusion on social media.  (*See* Docs. No. 20-1, 30-1.)  Though Defendants urge the Court to consider that more than 50,600,000 people have viewed Hydrojug ads in 2022 to date, these comments (other than example 6) are all publicly posted on social media websites.  (*Id.*)  Thus, while only a handful of consumers posted the comments, far more users would have viewed these comments in which users wrote that Hydrojugs are for sale, at a far lower price than Hydrojug advertised and of a subpar quality, at Five Below.  Moreover, though a handful of Hydrojug's 28 examples are difficult

31

to interpret or do not unambiguously demonstrate customer confusion (*see, e.g.,* Doc. No. 30-1, PageID# 383), the overwhelming majority of Hydrojug's examples illustrate that consumers have been, and continue to be, confused whether Hydrojug and Aquajug are related, or are the same product.

Additionally, Hydrojug's anecdotal examples of actual confusion are not isolated instances, as contemplated by the Sixth Circuit in *Daddy's Junky Music Stores* or instances of confusion spread out across a long period of time.  Rather, customer confusion began to crop up as soon as Aquajugs hit Five Below's shelves.  (*See* Doc. No. 20-1, PageID# 126, dated 3/6/2022.)  According to Hyer, the number of online comments Hydrojug receives confusing it with Aquajug continues to increase since March 2022.  (Doc. No. 35, 68:4.)  Hyer testified that she typically sees comments confusing the Aquajug for the Hydrojug on Hydrojug's social media posts at least three times a week, and sometimes as often as once per day.  (*Id.* at 68:23-25.)  Indeed, Hyer testified that Hydrojug received another comment confusing it with Aquajug the night before the preliminary injunction hearing.  (*Id.*)  Thus, the Court concludes this factor weighs in Hydrojug's favor.

### (5)    Marketing Channels

The factor regarding the extent to which the parties use the same marketing channels "requires an analysis of the parties' predominant customers and their marketing approaches."  *Therma-Scan*, 295 F.3d at 636. "The more channels and buyers overlap, the greater the likelihood that relevant consumers will confuse the sources of the parties' products." *Kibler*, 843 F.3d at 1079.  Conversely, "[w]here the parties have different customers and market their goods or services in different ways, the likelihood of confusion decreases."  *Therma-Scan*, 295 F.3d at 636.

Most parties advertise online.  *Kibler*, 843 F.3d at 1079 (citing *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011) (finding shared use alone of a ubiquitous marketing channel like the internet does not clarify the likelihood of confusion)).  Due to the ubiquity of online marketing, the Sixth Circuit has set forth the following considerations for deciding whether overlapping online marketing can support a finding of likely confusion:

> First, do the parties use the internet as a substantial marketing channel?  *Therma–Scan*, 295 F.3d at 637 (citing *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002)).  Second, are the parties' marks used with web-based products?  *Id. See, e.g., Brookfield Commc'n., Inc. v. W. Coast Entm't. Corp.*, 174 F.3d 1036, 1042, 1057 (9th Cir. 1999) (identifying "MovieBuff," which denoted software, and "moviebuff.com," which denoted a website, as marks used with web-based products).  Third, do the parties' marketing channels overlap in any other way?  *Therma–Scan*, 295 F.3d at 637.  Only one case has conducted this analysis and there it was straightforward: the plaintiff did not produce web-based products or market them online.  *Id.*

*Id.*

First, both parties use the internet as a substantial marketing channel.  According to Wadsworth, Hydrojug's marketing "is largely conducted on social media platforms such as Instagram and Facebook."  (Doc. No. 20-2, ¶ 8.)  Five Below also maintains active social media accounts where it advertises its products, including the Aquajug.  (Ex. 7 Five Below Facebook and Instagram, Doc. No. 20-2, PageID# 167-68.)  Hydrojug sells its products through its social media accounts, including through Instagram and Facebook.  (Doc. No. 35, 67:20-25.)  Likewise, Five Below also sells the Aquajug through its social media accounts.  (Ex. 7 Five Below Facebook and Instagram, Doc. No. 20-2, PageID# 168.)  Such simultaneous use of the internet—and particularly social media—"'as a marketing tool exacerbates the likelihood of confusion,' given that 'entering a web site takes little effort.'"  *Heaven Hill Distilleries*, 575 F. Supp. 3d at 835 (citing *Audi AG v. D'Amato*, 469 F.3d 534, 544 (6th Cir. 2006)).

33

Second, the parties' marks are not associated with web-based products.  *Kibler*, 843 F.3d at 1079.  Thus, this consideration is irrelevant to the instant dispute.

Third, the parties' marketing channels share some overlap.  Like nearly all businesses today, Hydrojug and Five Below sell their products online on their respective websites.  However, there is evidence that even third-party companies like Google conflate the two products.  Indeed, Hydrojug presented evidence that a Google shopping search for "Hydrojug" pulls up a sale listing for the Aquajug on Five Below's website.  (Ex. 8 Hydrojug Google Search, Doc. No. 20-2, PageID# 171.)  Further, both Hydrojug's and Five Below's bottles are available for purchase through third-party social media websites, as well as their own individual sites.  *Cf. Tailgate Beer, LLC v. Boulevard Brewing Co.*, No. 3:18-cv-00563, 2019 WL 5208186, at *9 (M.D. Tenn. Oct. 16, 2019) (concluding that there was no significant overlap in breweries' online marketing channels because each sold its respective merchandise only through its own independent website).

Additionally, Hydrojug and Five Below sell their products through brick-and-mortar stores.  (Doc. No. 20-2, ¶¶ 5-7.)  Hydrojug sells its products through retailers like Dick's Sporting Goods and Scheel's Sporting Goods, but not through Five Below.  (*Id.*)  Five Below sells its Aquajugs only at Five Below.  (*Id.*)  Though Defendants correctly point out that a customer will not encounter a Hydrojug and Aquajug on the same shelf or in the same store, it is conceivable that a shopper at a typical strip mall might see a Hydrojug for sale for $10-20 at a Dick's Sporting Goods and an Aquajug for sale for $5 at Five Below on the same shopping trip.  *See, e.g., Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 877 (Fed. Cir. 1992) (declining to limit "channels to trade" to identical stores).  This is sufficient to demonstrate at least some overlap in the parties' marketing channels.

34

On balance, this factor mildly favors Hydrojug.  Both Hydrojug and Five Below use similar marketing channels to target basically the same set of social media-savvy consumers, though the ubiquity of social media marketing and different brick-and-mortar availability somewhat reduce the weight this factor carries.  *See Heaven Hill Distilleries*, 575 F. Supp. 3d at 835.

### (6)      Likely Degree of Purchaser Care

When a mark is functionally identical, degree of purchaser care has little to no impact on the resolution of a case.  *AWGI*, 998 F.3d at 268.  As discussed above, Hydrojug's and Defendants' marks are functionally identical.  *See supra*.  Accordingly, the Court concludes that this factor is neutral and has no impact on the resolution of the case.

### (7)      Defendants' Intent in Selecting the Mark

"The intent factor concerns the defendant's 'intent to benefit' from the other mark's recognition."  *AWGI*, 998 F.3d at 268 (citing *Progressive*, 856 F.3d at 435).  According to the Sixth Circuit,

> This court may infer a likelihood of confusion from evidence that defendant chose its mark to confuse consumers about the source of the parties' products. *Therma-Scan*, 295 F.3d at 638. The standard assumes that defendant itself believed that using the mark would divert business from plaintiff. *Daddy's*, 109 F.3d at 286. Circumstantial evidence of intent is sufficient when direct evidence is unavailable (as it often is). *Therma-Scan*, 295 F.3d at 638-39. And evidence that defendant knew of plaintiff's trademark while using its mark constitutes such circumstantial evidence. *Daddy's*, 109 F.3d at 286–87. In *Champions*, the court treated testimony that defendant learned of plaintiff's trademark before using it as slight evidence that could support a finding of intent at trial. 78 F.3d at 1121. The testimony trumped the defendant's identification of independent reasons for choosing the mark, including the "championship" caliber of a local basketball team and horses. *Id.* Conversely, a lack of intent has no effect on the determination of likelihood of confusion.

*Kibler*, 843 F.3d at 1081.

35

Here, there is direct evidence that Goss examined Hydrojug's marks before creating the Aquajug for Five Below. Goss testified during the hearing that he conducted an "inspirational search on water bottles" in which he examined style guides promulgated by large retailers like Wal-Mart and Kroger. (Doc. No. 35, 90:25-91:9.) While searching through the style guides, he discovered the Hydrojug. (*Id.*) He further testified that he obtained and examined a Hydrojug water bottle before he designed the Aquajug. (*Id.* at 90:4-13; *see also* Goss Decl., Doc. No. 26-1, ¶¶ 4-5.) In other words, Goss discovered Hydrojug in a large retailer's "style guide" as an example of a product a large retailer wished to emulate, he then obtained a Hydrojug and examined it, and then he designed the Aquajug based on his examination of Hydrojug. This is direct evidence that Goss not only learned of Hydrojug's mark before creating Aquajug, but that he purposely intended to create an only slightly modified version of the Hydrojug mark for Five Below's product.

Defendants argue that this factor is neutral or has not been established in Hydrojug's submission. The Court disagrees. Goss's own declaration and his testimony establish this factor in

Hydrojug's favor.  Additionally, evidence was adduced during the hearing that the item numbers on the Aquajugs sold by Five Below end in the letters "HJ":



 (Plaintiff's Hearing Ex. 3.)  When the Court questioned Goss about the Aquajugs' item number stickers, Goss admitted that the manufacturer placed the stickers onto the Aquajugs at Gossi's direction.  (Doc. No. 35, 109:13-11.)  However, when the Court asked Goss what the "HJ" meant on the bottle, Goss replied: "I don't know that I created that, but I don't really know.  I can't speak for that but I'm just—you know."  (*Id.* at 110:14-16.)  When asked whether Gossi uses "HJ" in its item numbers, Goss replied that he didn't know of "HJ" being used in other item numbers.  (*Id.* at 111:2-3.)  When the Court asked whether "HJ" referred to "Hydrojug," Goss replied: "I can't speak for that personally that it is, I don't know, but it might be."  (*Id.* at 111:8-9.)  Given Goss's multiple admissions that he examined the Hydrojug before creating the Aquajug, it is incredible to believe that

the Aquajug product numbers end in "HJ" for any other reason than that Defendants purposely set out to create a cheap knockoff of Hydrojug and sell it at Five Below.

Accordingly, this factor weighs heavily in Hydrojug's favor.

### (8)    Likelihood of Expansion

"A strong possibility that either party will expand its business to compete with the other's increases the likelihood of consumers confusing the sources of the parties' products." *Kibler*, 843 F.3d at 1082. This factor is "neutral where neither party put forth evidence of significant expansion plans." *Maker's Mark*, 679 F.3d at 424.

The Court concludes this factor is neutral because the parties already compete by offering identical products for sale. *AWGI*, 998 F.3d at 268. Moreover, Defendants adduced evidence that they have no more backstock of versions 1 and 2 of the Aquajug, but intend to sell version 3 in the future, which has a different mark from the Hydrojug. *See infra.* Accordingly, the Court concludes this factor is neutral.

### (9)    Balancing the Factors

Considering all eight factors, the evidence presented in the parties' submissions and at the preliminary injunction hearing shows a strong likelihood of confusion. Ultimately, factors 1, 3, 4, and 7 weigh heavily in Hydrojug's favor. Factors 2 and 5 weigh moderately in Hydrojug's favor. Factors 6 and 8 are neutral and do not weigh in either side's favor. The Court is particularly mindful that there is ample anecdotal evidence of ongoing actual consumer confusion, as well as ample evidence that Defendants intentionally copied Hydrojug's marks and created a nearly identical mark. Accordingly, the Court finds that Defendants' conduct is likely to cause confusion and, therefore, that Hydrojug is likely to succeed on the merits of its trademark infringement claim.

2.      **Patent Claim**

Hydrojug asserts that it is likely to succeed on the merits of its patent infringement claim because Defendants' lids are identical to Hydrojug's patented design.  (Doc. No. 20, PageID# 115.) Moreover, Hydrojug argues that ordinary purchasing customers are "currently confusing the two products."  (*Id.*)  Defendants do not address whether Hydrojug demonstrates likelihood of success on the merits of its patent infringement claim in their Opposition.  (Doc. No. 25.)

Direct patent infringement is governed by 35 U.S.C. § 271(a), which provides that: "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent therefor, infringes the patent."  Direct infringement is a "strict-liability offense" and the alleged infringer's mental state is irrelevant.  *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632 (2015) (citation omitted).

The test for direct design patent infringement is the ordinary observer test.  "A design patent is infringed where the accused product is 'substantially the same' as the patented product and the resemblance is such that the ordinary observer would be induced into purchasing the accused product believing it to be the patent owner's product."  *Gold Crest, LLC v. Project Light, LLC*,  525 F. Supp. 3d 826, 839 (N.D. Ohio 2021) (quoting *Hall v. Bed Bath & Beyond, Inc.*, 705 F.3d 1357, 1363 (Fed. Cir. Jan. 25, 2013)).

The Court concludes that Hydrojug has demonstrated a likelihood of success on the merits of its patent infringement claim.  Gossi designed and manufactured over 150,000 version 1 Aquajugs with looped lids that were identical to Hydrojug's looped lid:



(*Compare* Plaintiff's Hearing Ex. 1 *to* Plaintiff's Hearing Ex. 2.)  Compare the lid of the Hydrojug on the left to the version 1 Aquajug lid on the right.  Both lids feature carrying loops, rippled lid bases, and curved flip caps that click into the spout to seal the bottle shut.  To an ordinary observer, these lids are nearly indistinguishable.

Further, Gossi was aware that its Aquajug lids were nearly indistinguishable from Hydrojug's patented lid design by February 17, 2022.  (Doc. No. 26-1, ¶¶ 10, 11.)  Indeed, the very next day, Goss ordered more than 84,000 looped lids removed and destroyed.  (*Id.*)  However, even by the time Gossi destroyed those 84,000 looped lids, the cat was out of the bag: 150,816 version 1 Aquajugs with looped lids were already en route to, or had arrived at, Five Below.  (*Id.*)  Though Goss apparently told someone at Five Below that Hydrojug had a design patent for the looped lid sometime between late February 2022 and April 18, 2022, Five Below nevertheless sold some of these 150,816 Aquajugs with looped lids.  Further, even though Gossi eventually shipped Five Below 84,000 version 2 Aquajugs without looped lids, Five Below continues to sell the version 1 Aquajugs and is also unable to determine how many version 1 Aquajugs remain on its shelves.  (Doc. No. 35, 104:19-105:1.)  At least some portion of the remaining 40,000 Aquajugs include version 1 bottles with looped lids.  According to Frischknecht's declaration, he received a version 1 Aquajug from the Five Below

website on August 3, 2022—several months after Five Below received the redesigned version 2 Aquajugs. (Doc. No. 30-2, ¶ 10.) Thus, Five Below continues to sell Aquajugs with looped lids that are virtually indistinguishable from Hydrojug's patented lid design.

Having determined that Hydrojug has established a likelihood of success on the merits of its trademark and patent infringement claims, the Court now turns to the second factor in the preliminary injunction analysis, whether Hydrojug will suffer irreparable harm without an injunction.

### B.      Irreparable Harm

"[T]he second factor that a court must consider when deciding whether to issue a preliminary injunction is whether the plaintiff will suffer irreparable injury without the injunction." *Certified Restoration*, 511 F.3d at 550. A plaintiff's injury is considered "irreparable if it is not fully compensable by monetary damages." *Overstreet,* 305 F.3d at 578. "[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).

#### 1.      Trademark Infringement

As of December 2020, the Lanham Act provides for a "rebuttable presumption of irreparable harm upon . . . a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction . . . ." 15 U.S.C. § 1116(a). In a trademark case, "irreparable injury flows both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values . . . ." *Wynn Oil Co. v. Am. Way Service Corp.*, 943 F.2d 595, 608 (6th Cir. 1991) (internal quotation omitted).

Because the Court has concluded that Hydrojug is likely to succeed on the merits of its trademark infringement claim, § 1116(a)'s presumption of irreparable injury applies. Nevertheless,

Defendants attempt to rebut the presumption in two ways. First, Defendants argue that Hydrojug delayed in seeking the instant preliminary injunction for four months. (Doc. No. 25, PageID# 214.) Second, Defendants argue that the alleged infringing products are a "limited order," and therefore the Court should not find irreparable harm that justifies a nationwide injunction. (*Id.*) Neither attempt to rebut the presumption is persuasive.

First, the Court disagrees that Hydrojug delayed in seeking a preliminary injunction. Hydrojug did not sit on its hands upon learning of Defendants' alleged infringement. Instead, on April 18, 2022, roughly one month after Five Below began selling Aquajugs, Hydrojug's counsel, Frischknecht, sent Defendants cease-and-desist letters, which identified the relevant registered trademarks and patent at issue. (Doc. No. 30-2, ¶ 2.) From April 27, 2022 through May 13, 2022, Hydrojug's counsel engaged in settlement negotiations with Defendants' previous counsel. (*Id.* at ¶ 4.) Concurrently, Hydrojug filed its Complaint on May 5, 2022. (Doc. No. 1.) On June 6, 2022, Defendants' new counsel, Rebecca Haverstick, Steve Auvil, and Eleanor Hagan, sought a nearly six-week extension, or until July 15, 2022, to answer or otherwise respond to Hydrojug's Complaint. (Doc. No. 12.) On July 18, 2022, Hagan sent Frischknect a letter referencing a prior call between Defendants' counsel and Frischknecht. (Doc. No. 30-2, PageID# 397.) Thus, Defendants' counsel were aware no later than July 18, 2022 (only three days after Defendants filed their Answer) that Hydrojug intended to seek injunctive relief. During these three months, April 18, 2022 through July 18, 2022 (which included Defendants' nearly six-week extension to respond to Hydrojug's Complaint), Hydrojug attempted to stop Defendants from continuing to infringe on its trademarks through cease-and-desist letters, negotiation, and then filing a Complaint. When those efforts proved unsuccessful, and Defendants continued to sell the allegedly infringing Aquajugs, Hydrojug filed the

instant Motion for Preliminary Injunction. The Court will not punish Hydrojug for attempting to resolve the dispute without judicial intervention in the first instance. *See Heaven Hill Distilleries*, 575 F. Supp. 3d at 842 (rejecting laches argument to rebut presumption of irreparable harm and concluding that equity does not require a plaintiff to begin by seeking a "drastic" "expedited federal-court injunction").

Second, the Court disagrees that Defendants should be permitted to finish out their course of infringement simply because only a limited number of bottles remain to be sold. (Doc. No. 25, PageID# 214.) Hydrojug has presented evidence that its brand and reputation are suffering harm as a result of Defendants' cheap knockoffs. *See supra*. Public comments accusing Hydrojug of running "scammy ads," warning customers away from buying "Hydrojugs" at Five Below because they leak, and encouraging other customers to "do their research" before "impulse buying" a more expensive Hydrojug online rather than at Five Below are likely to significantly damage Hydrojug's brand and reputation, and further demonstrate that Hydrojug may be losing control over its own brand as a result of Defendants' actions. These types of harms cannot be repaired by monetary damages as Defendants assert but are the precise types of irreparable harm that the Lanham Act seeks to prevent. Accordingly, the Court concludes that Defendants have not rebutted Hydrojug's presumption of irreparable harm.

### 2.    Patent Infringement

Hydrojug generally asserts that Defendants' "multiple infringements overlap in effect and each contribute towards the demonstrated confusion, reputational harm and loss of control, brand recognition, and goodwill in the market." (Doc. No. 20, PageID# 116.) Hydrojug also asserts, without evidence, that Defendants' patent infringement has led to price erosion of the Hydrojug. (*Id.*)

Defendants argue that Hydrojug fails to assert any substantive evidence of irreparable harm and instead relies on conclusory statements.  (Doc. No. 25, PageID# 213.)  Defendants also assert that Wadsworth concedes in his Declaration that Hydrojug has not suffered any price erosion because of Five Below's sales of Aquajugs.  (*Id.*)

Irreparable harm may be shown by loss of revenue, brand recognition, goodwill, market position, and price erosion.  *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010); *cf. Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 692 F. Supp. 2d 805, 821 (N.D. Ohio 2010) (concluding that any potential loss of customer goodwill remained speculative).

The Court concludes that Hydrojug has demonstrated that it will suffer irreparable harm if Defendants are not enjoined from continuing to sell their infringing product—specifically version 1 of the Aquajug.  Hydrojug presented multiple examples of customers mistakenly complaining to Hydrojug's customer service department, impugning the Hydrojug bottle on social media as being of poor quality when the customers purchased a $5 Aquajug from Five Below, or accusing Hydrojug of being an untrustworthy brand because its supposed "products" were available at Five Below for $5. (*See, e.g.,* Doc. No. 20-1, PageID# 131, 137, 138.)  Additionally, Wadsworth testified that the flip cap on Plaintiff's Hearing Exhibit 2, a version 1 Aquajug, was not even close.  (Doc. No. 35, 31:12.) Upon the Court's own examination of Plaintiff's Hearing Exhibit 2, it is apparent that the Aquajug flip cap, though visually indistinguishable from Hydrojug's, is not of the same make and quality as Hydrojug.  The Court concludes that the potential for loss of customer goodwill is significant, given the demonstrated difference in quality between the two products.  So long as Defendants continue to sell low-quality Aquajugs that closely mimic Hydrojug's patented lid design, Hydrojug's brand and reputation remain in jeopardy.

### C.    Substantial Harm to Others

Next, the Court must consider "whether a preliminary injunction would cause substantial harm to others." *Flight Options, LLC v. Int'l Brotherhood of Teamsters, Local 1108*, 863 F.3d 529, 540 (6th Cir. 2017).  The Court finds that this factor weighs in favor of granting the injunction with respect to the trademark and patent claims.  Neither party has presented any evidence that any third parties will suffer harm if Defendants are enjoined from continuing to infringe on Hydrojug's right to exclusive use of its trademark and patent rights.  To the extent that an injunction preventing Defendants from selling any more version 1 or version 2 Aquajugs might harm Defendants, that harm is self-inflicted and outweighed by the harm to Hydrojug's brand, as discussed above.  *See Heaven Hill Distilleries*, 575 F. Supp. 3d at 843-44 (concluding that an infringer who decided to willfully expend funds on infringing activity cannot claim those losses as grounds for denying injunctive relief).  Thus, the Court concludes this factor weighs in favor of granting the preliminary injunction.

### D.    Public Interest

The fourth and final factor courts must consider when granting a preliminary injunction is "whether the public interest will be served by an injunction." *Flight Options*, 863 F.3d at 540.  The Court finds that this factor weighs in favor of granting the preliminary injunction.  With respect to Hydrojug's trademark infringement claim, the general public is a key beneficiary of the federal trademark system because the federal trademark system "'has a great interest in administration of the trademark law in a manner that protects against confusion.'" *Heaven Hill Distilleries*, 575 F. Supp. 3d. at 843  (quoting *Guthrie Healthcare System v. ContextMedia, Inc.*, 826 F.3d 27, 50 (2d Cir. 2016)).  Violations not only inhibit competition, but also "deprive customers of their ability to distinguish among the goods of competing manufacturers." *Inwood Laboratories, Inc. v. Ives*

*Laboratories, Inc.*, 456 U.S. 844, 854 n.14 (1982).  Here, Hydrojug presented significant evidence of actual consumer confusion due to Defendants' infringing activities.  As the *Heaven Hill* court aptly concluded, "[t]he purchasing public has a clear interest in not being confused or led astray."  *Id.*

Additionally, the United States Constitution itself reflects a strong public policy interest in "promot[ing] the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  U.S. Const. art I, § 8, cl. 8.  The Constitution delegated this power to Congress, who, in turn, promulgated the patent statute, 35 U.S.C. § 271, prohibiting patent infringement.

Accordingly, the Court concludes that the public interest benefits if an injunction is granted.

**E.	Whether Defendants Should be Enjoined from Releasing Aquajug Version 3**

During the hearing, Defendants requested, and the Court allowed, supplemental briefing about whether Hydrojug was also entitled to a preliminary injunction with respect to Defendants' version 3 Aquajugs.  (Doc. No. 35, PageID# 441.)

In their supplemental opposition, Defendants argue that they should not be enjoined from selling version 3 of the Aquajug.  Defendants reassert that Hydrojug cannot demonstrate likelihood of success on the merits of its trademark claim for the reasons previously set forth in its initial Opposition.  (Doc. No. 36, PageID# 556.)  Defendants argue specifically that the version 3 Aquajug mark is now substantially different from Hydrojug's mark, that Hydrojug is overreaching with its request to preclude the use of common symbols and words associated with water and plastic containers, and that there is no evidence of actual confusion because version 3 is not yet sold in stores. (*Id.* at PageID# 557-59.)

46

In its supplemental reply, Hydrojug argues that Defendants' latest attempt to sell Aquajugs is prohibited under the Safe Distance Rule—an argument asserted for the first time in Hydrojug's supplemental reply—and, therefore, Defendants should be enjoined from using *any* colorable imitation of Hydrojug, including the word mark "AQUAJUG" on oversized water bottles in combination with the version 3 logo.  (Doc. No. 37, PageID# 562.)  Hydrojug further argues that the version 3 mark and Hydrojug's mark are still "highly similar if not virtually identical," and that Defendants' small changes will not reverse ongoing consumer confusion.  (*Id.* at PageID# 563-64.)

The Court allowed Defendants until August 31, 2022 to file a surreply in response to the Safe Distance Rule argument.  (ECF Order 8/25/2022.)  Defendants filed a surreply on August 31, 2022, arguing that the Safe Distance Rule did not apply for several reasons, including that the rule is only deployed after final determinations on the merits and/or in contempt proceedings, that it is not applicable to patent infringement claims, and that, even if it did apply, Hydrojug's request nevertheless falls outside of the scope of its cited case law.  (Doc. No. 38, PageID# 570.)

### 1.    Application of the *Frisch* Factors to Version 3 of the Aquajug

As discussed above, the *Frisch* factors are a guide to help determine whether confusion is likely, but do not imply any mathematical precision.  *Daddy's Junky Music*, 109 F.3d at 280.  These factors are interrelated and, in the course of applying them, the ultimate question remains "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way."  *Therma-Scan*, 295 F.3d at 630.

Based on the Court's comparison of the Hydrojug to version 3 of the Aquajug, the Court concludes that consumers are not likely to believe that Defendants' version 3 Aquajugs are affiliated with Hydrojug's bottles.  Defendants' revised mark is noticeably dissimilar from Hydrojug's marks.

47

Because "[s]imilarity of marks is a factor of considerable weight," *Daddy's Junky Music*, 109 F.3d at 280, the Court concludes that the *Frisch* factors as applied to version 3 do not suggest a likelihood of confusion between the two products.

Specifically, this new dissimilarity between the marks changes the Court's analysis with respect to factor two (relatedness), factor three (similarity of the marks), factor four (likelihood of confusion), and factor seven (Defendants' intent).[9]  Regarding the second factor, the relatedness of the goods, much of the Court's reasoning for concluding that the Hydrojug and versions 1 and 2 of the Aquajug are related is that these bottles each display nearly identical marks.  *See supra*.  Thus, it appeared that Defendants intended to undercut Hydrojug by marketing versions 1 and 2, which were merely cheaper imitations of a nearly identical bottle.  *Id.*  However, this concern is alleviated due to the significant changes in the logo design.  As discussed below, Defendants' redesigned version 3 logo renders the bottles no longer identical.  Accordingly, the Court concludes that the second factor is neutral with respect to version 3.

Regarding the third factor, similarity of the marks, the Court concludes that these marks are not visually similar to one another:

---

[9] The Court adopts its analysis with respect to the remaining *Frisch* factors, as set forth in III.A.1.a, herein.

48





(*Compare* Plaintiff's Hearing Ex. 1 and Plaintiff's Hearing Ex. 3 *with* version 3 Aquajug, Doc. No. 36, PageID# 556.)  Once again, taking the overall appearance of the marks into consideration, the Court concludes that version 3's mark is no more similar to Hydrojug's mark than many of the examples that Defendants appended to their Opposition.  (*See* Doc. No. 26-5.)  True, version 3 still uses a water droplet, but this droplet is no longer a solid-color droplet with a single letter inside of it and a dumbbell surrounding it.  Now, the droplet shape itself is "split" horizontally by the word "AQUAJUG" and features wavy lines, which connote running water, inside the droplet.  The word "AQUAJUG" is no longer formatted in a nearly identical font to "HYDROJUG," but is printed in an entirely different, narrower sans serif font.  Moreover, version 3's font no longer features an identical combination of bold and narrow sans serif fonts and extensive spacing between each letter, like the

49

Hydrojug logo.  Importantly, the dumbbell is missing and so version 3 of the Aquajug no longer bears any visual connection to, or connotes working out or exercise.  Thus, version 3 has no immediate visual connection to customers who are pursuing "active lifestyle goals," Hydrojug's primary market.

True, Defendants continue to use the word "AQUA" as part of their mark.  "AQUA" is a two-syllable synonym for water, like "HYDRO."  However, when the word "AQUA" is considered as part of the overall impression of the overhauled version 3 logo, the similarity between two synonyms for water becomes far less important because there is simply little chance a customer could mistake this new logo for Hydrojug's logo.  These two logos are too dissimilar.

The Court disagrees with Hydrojug's assertion that version 3 and Hydrojug's marks are still "very highly similar if not virtually identical."  (Doc. No. 37, PageID# 563.)  Hydrojug vastly overstates the similarities between the two.  Moreover, Hydrojug's argument that the shape of the bottles remains identical is a non-starter.  Hydrojug never asserted that the shape of the bottle itself is subject to any intellectual property protections.  Further, Hydrojug asserts that it has been "unable to confirm" whether Defendants ever omitted a carry loop from their lid and that, in all other respects, the bottle remains the same.  (Doc. No. 37, PageID# 565, n.4.)  It is unclear how Hydrojug's assertion that it has been "unable to confirm" whether Defendants omitted the carry loop advances its argument with respect to version 3 of the Aquajug, as version 3 clearly does not incorporate any carry loop on its lid and features a totally different logo.[10]  Given the strong visual differences between version 3 and

---

[10] Moreover, during the August 17, 2022 hearing, the Court told Hydrojug that it was prepared to order Five Below to immediately remove all Aquajugs with carry loops from its shelves that day, while reserving a decision on Hydroug's overall motion for injunctive relief.  (Doc. No. 35, 119:3-10.)  However, Hydrojug declined the Court's offer to immediately enjoin Five Below from selling any more Aquajugs with looped lids.  (*Id.* at 120:3-23.)  Hydrojug's complaint that Defendants continue to sell bottles with looped lids is not well-taken, as Hydrojug declined the Court's offer of immediate partial relief.  (*Id.*)

Hydrojug's marks, the Court concludes that this factor weighs strongly against likelihood of confusion.

Regarding the fourth factor, evidence of actual confusion, version 3 is not yet for sale and so any possibility of actual confusion between Hydrojug and version 3 is theoretical.  Moreover, many of Hydrojug's examples of actual confusion included comments that the Aquajug at Five Below featured the "same" logo as the Hydrojug.  (*See, e.g.,* Doc. No. 20-1, PageID# 129, 137.)  As discussed above, the version 3 Aquajug logo is not remotely the "same" logo and is clearly dissimilar from the Hydrojug mark.  It seems unlikely that even the most casual consumers or social media users could confuse the Hydrojug mark for the version 3 mark.  As discussed at length above, the dumbbell is gone, the fonts no longer match, and the version 3 droplet no longer resembles a Hydrojug water droplet.  Because the current consumer confusion revolves around a significantly different logo and any consumer confusion with respect to version 3 remains theoretical, the Court concludes that this factor weighs slightly against likelihood of confusion with respect to version 3.

Finally, regarding the seventh factor, Defendants' intent in selecting the mark, the Court concludes this factor is now neutral at best.  After the filing of this lawsuit and Motion for Preliminary Injunction, Defendants completely redesigned the Aquajug logo so that it no longer resembles the Hydrojug logo.  This indicates Defendants now apparently intend to avoid the possibility of further potential infringement.  Thus, this factor is now neutral.

Upon reweighing the *Frisch* factors with respect to version 3, the Court concludes that factor three weighs strongly against a finding of likelihood of confusion, that factors two and four weigh mildly against a finding of likelihood of confusion, and that, as discussed *supra*, the remaining factors are either neutral or irrelevant in deciding the issue.  Accordingly, the Court concludes that Hydrojug

has not demonstrated that Defendants' Aquajug version 3 is likely to cause consumer confusion. As such, Hydrojug has not demonstrated success on the merits with respect to version 3. The Court concludes that Defendants should not be enjoined from selling version 3.

### 2. Whether the Safe Distance Rule Applies

Hydrojug also argues that the Safe Distance Rule bars Defendants from selling version 3, even if version 3 would not otherwise unlawfully infringe on Hydrojug's trademarks. (Doc. No. 37, PageID# 566.) This argument is not well-taken. "The Safe Distance Rule gives courts a particularly useful tool in crafting and enforcing *permanent injunctions*." *Innovation Ventures, LLC v. N2G Dist., Inc.*, 763 F.3d 524, 544 (6th Cir. 2014) (emphasis added). This "little used tenet" operates to "prevent *known* infringers from using trademarks whose use by non-infringers would not necessarily be actionable." *Taubman Co. v. Webfeats*, 319 F.3d 770, 778-79 (6th Cir. 2003) (citing *Broderick & Bascom Rope Co. v. Manoff*, 41 F.2d 353 (6th Cir. 1930)) (emphasis added).

The Court concludes this rule does not apply at this juncture. First, Hydrojug has only demonstrated a *likelihood* of success on the merits, so as to warrant a *preliminary* injunction. Whatever the strength of Hydrojug's case at this point, no final judgment or permanent injunction have yet been entered against Defendants. The procedural posture of the instant matter cautions against deploying the Safe Distance Rule, which is punitive in nature, when Defendants have not yet been adjudged liable for trademark infringement. *See Vining Indus., Inc. v. M.B. Walton, Inc.*, 106 F. Supp. 2d 966, 973-74 (S.D. Ohio 1997) (declining to apply the Safe Distance Rule in the preliminary injunction context); *see also, e.g., IP, LLC v. Interstate Vape, LLC*, No. 1:14CV-00133-JHM, 2014 WL 5791353, at *8-9 (W.D. Ky. Nov. 6, 2014) (same); *CrossFit, Inc. v. Mustapha*, No.

13-11498-FDS, 2014 WL 12644258, at *12-13 (D. Mass. Aug. 4, 2014) (same), *report and recommendation adopted* at 2014 WL 12644305.

    **F.**    **Bond**

    Fed. R. Civ. P. 65(c) provides that a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Although the language of Rule 65(c) appears to be mandatory, the rule in the Sixth Circuit "has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). Thus, "[w]hile a district court must consider whether security is appropriate, the court need not actually require security—instead, the decision is left to the sound discretion of the court." *Midwest Guar. Bank v. Guar. Bank*, 270 F. Supp. 2d 900, 925 (E.D. Mich. 2003).

    In their supplemental brief in opposition, Defendants request that the Court require Hydrojug to post a modest bond between $10,000-25,000. (Doc. No. 36, PageID# 559.) Defendants assert that the costs to "remove product containing the lid with the 'carry strap' from shelves would be largely internal." (*Id.*) In response, Hydrojug argues that Defendants still have not provided any facts or reasoning to justify its various bond requests, which have ranged from $500,000 down to $10,000. (Doc. No. 37, PageID# 567.) Hydrojug argues that a "simple email from Five Below" directing store employees to remove versions 1 and 2 from the shelves and simply holding version 3 from distribution would impose little or no cost on Defendants. (*Id.*)

    Based on the strength of Hydrojug's case, the Court concludes that Hydrojug must post a modest bond of $10,000. As Finan testified during the hearing, it would cost nothing for Five Below

to email its stores about removing the Aquajugs from the shelves, and the only cost likely to arise would be "a very small cost" associated with the labor required to physically remove the bottles from shelves.   (Doc. No. 35, 106:3-9, 107:11.)   A $10,000 bond will cover the cost of removing *all* remaining versions 1 and 2 Aquajugs from Five Below's shelves (estimated to be no more than 40,285 bottles at the time of the hearing).

**IV.    Conclusion**

For the reasons set forth above, Hydrojug's Motion for Preliminary Injunction (Doc. No. 20) is GRANTED as follows:

Defendants, their agents, servants, and any and all parties acting in concert with any of them are temporarily and preliminarily enjoined from:

A. using the AQUAJUG mark as depicted in versions 1 and/or 2, or any similar variations thereof;

B. using any trademark that imitates or is confusingly similar to the HYDROJUG Mark, or is likely to cause confusion, mistake, deception, or public misunderstanding as to the origins of Defendants' goods or their relatedness to Hydrojug;

C. engaging in trademark infringement, unfair competition, false designation of origin, or other activities that misappropriate Hydrojug's trademark rights;

D. making, using, offering to sell, or selling the Accused Products (as identified in the complaint, but not including "version 3" of the Aquajug depicted above) and any other water bottle sleeve design that infringes the '202 Patent;

E. directly or indirectly infringing in any manner any of the claims of the '202 Patent; and

54

F. from aiding, assisting, or abetting any other party in the acts prohibited by (A) through (E) above.

Defendants are further directed to file with the Court and serve upon Hydrojug's counsel within three days after entry of this judgment a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with this Order.

**IT IS SO ORDERED.**

<br>

                                      *s/Pamela A. Barker*
                                      PAMELA A. BARKER
Date:  September 2, 2022            U. S. DISTRICT JUDGE